UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JEANA BARENBOIM, JOSE ORTIZ, and
REVANS RAGBIR on behalf of themselves     INDEX NO: 08-cv-3318 (LTS)
and others similarly situated,

           Plaintiffs,

  v.

STARBUCKS CORPORATION,

           Defendant.
-------------------------------------------------------x

## DECLARATION OF MAIMON KIRSCHENBAUM

I, Maimon Kirschenbaum, under penalty of perjury, affirm as follows:

1. My name is Maimon Kirschenbaum, and I am a member of Joseph & Herzfeld LLP, Plaintiffs' counsel in the above-captioned matter.

2. Joseph & Herzfeld LLP is a law firm dealing almost exclusively with employee rights. Specifically, the firm represents employees in wage/hour and employment discrimination matters.

3. I manage the firm's food service wage and hour department.

4. Over 80% of my personal current docket involves class action lawsuits against New York City restaurants for wage and hour violations.

5. During the last 2 years, I (and my firm) filed 24 multi-plaintiff actions on behalf of people employed in the New York food service industry

6. Sixteen of these actions were class/collective actions alleging violations of New York Labor Law § 196-d for misappropriated tips. In litigating these cases, I have

spent the majority of the last year researching and discussing with experts all cases, legislative history, administrative decisions, related to § 196-d.

7. Six of these actions have been approved as collective actions under the FLSA, 29 U.S.C. § 216(b) with my firm and I as lead counsel, and we have been approved three times as lead counsel pursuant to Rule 23.

8. Nine of the cases alleging violations of § 196-d have settled for a total recovery of close to $9,000,000. (Some are pending approval by the Court.)

9. As a result of these lawsuits, we have recovered significant sums of money for thousands of New York City restaurant employees.

10. My work has attracted significant media attention and contributed greatly to a city-wide movement on behalf of food service employees. (I have attached as Exhibit A several representative media articles pertaining to my work in this area).

11. On April 3, 2008, Jeanna Barenboim filed the above-captioned action, against Defendant challenging Starbucks' policies regarding the appropriation of Baristas' tips.

12. In preparing the case, my firm and I interviewed several current and former Starbucks baristas and shift supervisors to determine the strength of the claims in this lawsuit.

13. Since the <u>Barenboim</u> lawsuit was filed, an amended complaint, with two additional named plaintiffs, was filed.

14. Attached as Exhibit B is a New York Times Article relating to the above-captioned lawsuit.

15. On June 3, 2008 Ms. Liss-Riordan and I discussed with Wolf Popper, counsel in a related matter, whether our firms could work cooperatively on the case. Mr.

2

Liss-Riordan proposed that the firms work collaboratively. Despite our several alternative suggestions, Wolf Popper hostilely rejected our suggestions (with Attorney Levy shouting at Attorneys Kirschenbaum and Liss-Riordan) and refused to discuss and/or negotiate any arrangement other than its original proposal: that it have a full vote equal to the votes of both Pyle Rome and Joseph & Herzfeld combined and that it be guaranteed one-half of any attorneys' fees recovered, regardless of the amount of work it performed on the case.

16.     I subsequently made clear to Wolf Popper that we were open to further discussions regarding collaboration on this case. However, Wolf Popper counsel failed to engage in any meaningful discussions attempting to resolve the issue of class counsel before filing their motion.

I affirm, under penalty of perjury, that the above and foregoing information is true and correct.

Dated: August 6, 2008

/s/ D. Maimon Kirschenbaum
Maimon Kirschenbaum

Home   The Magazine   Blogs   Video   Mostly Sunny 85° » 5-day                                    You are not logged in   Log In   Register

## New York Magazine



3/23/07                         *NewsFeed*                         3:00 pm

# Upper West Side Diners Allegedly Paying Waiters in Ham Sandwiches

Lawyer Maimon Kirschenbaum, the patron saint of underpaid waiters, has a new target. Kirschenbaum recently sued Heartland Brewery for shortchanging its part-time employees, and now he's filed a lawsuit alleging that busboys and waiters at four Upper West Side diners owned by Fanis Tsiamtsiouris — City Diner, Metro Diner, Key West Diner, and Manhattan Diner — were illegally paid a flat rate of $120 and $130 respectively (plus tips) for 60-hour workweeks (meaning they were paid about two bucks an hour). Joining busboy Raul Mendez in the class-action suit is chef Matthew Davis, who came to the diner after stints with Todd English and at Moomba and the Water Club. Davis tells us that over the next four years he was paid $100 less per week than he was originally promised; he says he was fired a day after the lawsuit was filed: "The owner said, 'The place is not busy anymore.'" Tsiamtsiouris could not be reached for comment, but a 2004 *New York* article about diner economics hardly portrays him as a cheapskate: The man paid a decorator $40,000 to snazz up his City Diner.

Share       Email   Link   Print



**YOU WILL BE PROMPTED TO REGISTER OR LOGIN WHEN POSTING.**

COMMENT                                    0 of 350 words allowed. HTML and URLs prohibited

» User Guidelines                                          PREVIEW    POST COMMENT

Ads by Google                                                                       Advertise on this Site

**Limo Express 800.221.2345**
Excellent Service for over 30 years Serving Northern New Jersey & NYC
www.limoexpressnj.com

Copyright © 2008, New York Media LLC. All Rights Reserved.

  

May 12, 2007

## Suits Alleging Pay Violations at Restaurants

**By STEVEN GREENHOUSE**

Restaurant owners in Manhattan have long had plenty to worry about, like soaring rents and exacting customers, but now they face a new and costly problem: a record number of lawsuits accusing them of stealing tips and cheating on wages.

Though battles between managers and workers have been a staple at many restaurants, these lawsuits involve some of the most popular restaurants in New York, including the Old Homestead, the Brooklyn Diner, Smith & Wollensky, Sparks Steak House, Heartland Brewery and Mr. Chow.

Waiters, bartenders and busboys say the number of suits has exploded because they have grown tired of what they describe as being shortchanged on wages and tips. But many restaurants say a different force is behind the lawsuits: greedy lawyers.

The legal showdown has rocked Manhattan's restaurant establishment over the last year, as workers have picketed outside restaurants, armed with megaphones and even drums, angering owners and unnerving diners. Some restaurateurs have become so angry that they have sued their detractors for slander.

New York State's labor commissioner, M. Patricia Smith, called the violations widespread and serious. "It's clearly a big problem," she said. "It's reached a tipping point in the industry. When it becomes the standard practice to cut corners, then everybody starts doing it."

Brandon Salus, a waiter, sued B. B. King Blues Club and Grill, on West 42nd Street, saying it had misappropriated his wages by docking his pay $240 after four of his customers sneaked out without paying their check.

Mark Fisher, a waiter and Off Broadway actor, joined a lawsuit against Fiorello's, across from Lincoln Center, that claims that he and other workers were not paid overtime and were forced to share tips with managers, even though state law bars managers from taking any portion of workers' tips.

Peter Fasanelli, a bartender at Heartland Brewery on West 43rd Street, has sued the chain, asserting that its managers cheated workers of wages by illegally erasing hours from their time records. The lawsuit also accuses Heartland of not paying employees for their first week of work and of ordering workers not to clock in during banquets.

"We would look at our paychecks at the end of the week, and we'd see that our hours are missing more and more," said Mr. Fasanelli, 40, a self-described struggling actor. "We'd bring it to their attention, and their attitude was, 'Just forget the whole thing and keep your mouth shut.'"

More than two dozen Manhattan restaurants have been sued in the past year, including several Chinese restaurants sued by their deliverymen. Restaurant owners have denied doing anything illegal, suggesting that some plaintiffs' lawyers see their establishments as targets with deep pockets.

"The restaurant industry is the largest private-sector employer in New York State," said Carolyn D. Richmond, a lawyer for Heartland Brewery. "The industry is a target."

Marc Sherry, co-owner of the Old Homestead, added, "I think it's a group of attorneys who are trying to cash in."

Others involved in the industry give many explanations for the burst of lawsuits, including a growing awareness of workers' rights.

"It's been a renegade industry for a long time," said Justin Swartz, a lawyer who has sued Fiorello's, Shelly's, Trattoria Dell'Arte and several other restaurants owned by the Fireman Group. "But the workers are finally starting to learn their rights, and they're coming forward."

Commissioner Smith said the industry employed "many actors and immigrants who were desperate for work and were traditionally loath to speak up, but they've grown emboldened."

Clark Wolf, a consultant to many restaurants, said some owners were cutting corners because of fierce competition and a financial squeeze fueled by fast-rising rents.

"Some of the costs are going through the roof, and some of the business models don't work," he said. "You really can't afford to do a 70-seat restaurant any more."

John Fireman, co-owner of the Fireman Group, blamed the Restaurant Opportunities Center — an advocacy group formed to help workers from Windows on the World, the restaurant that was atop the World Trade Center — for much of the litigation. The group has organized protests outside restaurants and has compiled workers' grievances, helping form the basis for lawsuits.

"Longstanding institutions such as the Fireman Group" provide an excellent public relations platform for the Restaurant Opportunities Center, Mr. Fireman said. He said the group "is absolutely waging a campaign for attention and probably money, too."

To ratchet up pressure on the city's restaurants, the Restaurant Opportunities Center persuaded several City Council members to introduce legislation this week that would make it difficult for restaurants with wage violations to renew their operating permits.

"They've been able to get away with a lot of violations for years," said Saru Jarayaman, the executive director of the center, which has distributed guides to restaurant employees explaining their rights.

Several restaurant workers said they turned to lawyers rather than the federal or state labor departments because government officials often respond more slowly and because in New York, the Labor Department usually seeks just two years of back wages to be paid to employees whose cases it presses, while lawyers often file claims covering six years of back pay.

All the suits are in preliminary stages except the one against Smith & Wollensky, in which the parties have signed settlement papers. The agreement calls for waiters to receive $1,750 in back wages for each year worked, with the restaurant paying a maximum of $625,000..

Lawyers and workers' advocates say that some restaurateurs seem to believe that because some waiters can earn $1,000 or even $1,500, a week in tips, as well as the $4.60-an-hour minimum wage, they are entitled to slice some of their wages.

That, industry experts say, helps explain why some restaurants pay workers for 40 hours of work even though they actually work 50 hours and why waiters are sometimes forced to share tips with managers and kitchen workers, in violation of state law.

"There's a mentality of the restaurant owners, 'I'm struggling to make a buck and these guys are making a lot of money,' which is not always the case," said Maimon Kirschenbaum, a lawyer involved in suits against Heartland Brewery and B. B. King's. He said many waiters received less than $100 a day in tips.

Mr. Kirschenbaum added that his firm had solicited clients by placing advertisements on the Web site shamelessrestaurants.com, where waiters often vent their grievances.

Plaintiffs' lawyers say cheating on wages usually hurts busboys the most because they receive far less in tips than waiters.

Some lawsuits accuse even prominent restaurants of minimum wage violations. Under state law, tipped employees like waiters and busboys are supposed to be paid a minimum of $4.60 an hour.

But the lawsuits claim that illegal deductions, for things like uniforms and cleaning, sometimes pull their wages below the minimum wage.

The lawsuits often accuse restaurants of keeping a large part of the service charges for banquets, not paying time and a half for overtime and not paying a state-required three hours in wages when waiters are ordered to show up, but are then sent home without any work.

At some restaurants, the lawsuits have led to internal friction among workers, with one camp supporting the suit and arguing that management should be held accountable, and the other camp viewing the plaintiffs as sabotaging the restaurant's business.

Charges of retaliation have added to the tensions. After bringing their original suit charging misappropriation of tips, several waiters at Sparks Steak House on East 46th Street filed a separate lawsuit accusing Sparks of retaliation.

Saied Salem, a waiter at the restaurant for 14 years, said he was fired for wearing a worn-out cummerbund days after he joined the suit brought by 60 current and former waiters.

In that same lawsuit, Carlos Zufriategui, a Sparks waiter for 24 years, said management abruptly fired him, saying it had received a complaint from a customer. Mr. Zufriategui questioned that explanation, noting that the customer who had reportedly complained had given him a $110 tip on a $534 bill. Sal Desai, a Sparks

spokesman, declined to comment.

The waiters who sued Sparks also said a manager had responded by calling them "drug addicts" and "alcoholics" and using ethnic and sexual slurs.

Scott Debus, a waiter at Fiorello's, said in an affidavit that a manager grew so enraged at him for suing that he stormed in while Mr. Debus was in a bathroom stall, kicked the stall door open and violently squeezed his arm.

Mr. Fisher, the waiter at Fiorello's who is also part of the suit, said he was told by a manager that the restaurant was "trying to weed out the waiters who were involved in the complaint."

But Mr. Fireman said the Fireman Group's restaurants, including Fiorello's, were model employers. He denied that managers retaliated against workers, withheld overtime or committed other wage violations.

"At our restaurants," he said, "the tips are good, and people want to work here."

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

 

July 10, 2007

# Manhattan: Ex-Restaurant Workers Sue

**By JAMES BARRON**

Jean-Georges Vongerichten has become the latest restaurateur to be accused of stealing waiters' tips and cheating on wages. The allegations, in a lawsuit filed yesterday in Federal District Court by six former employees, involve the restaurant V Steakhouse in the Time Warner Center at Columbus Circle. V Steakhouse closed at the end of 2005. The lawsuit accuses V Steakhouse of illegally dividing tips among the restaurant's managers as well as the servers, busboys and captains. The lawsuit also says that because V Steakhouse handled the tips that way, it underpaid the nonmanagerial employees, because they earned less than the minimum wage under state law, which was $6 an hour when the restaurant closed. D. Maimon Kirschenbaum, the lawyer representing the former V Steakhouse workers, said restaurant owners are allowed to pay employees who receive tips less than the minimum wage, but not if the tips are divided among "nontipped employees" like managers. Calls to Mr. Vongerichten's office were not returned yesterday.

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map




# Nobu was no fair, suit claims

## Former wait staff accuse De Niro's eatery of bilking tips

**By LARRY NEUMEISTER**
**THE ASSOCIATED PRESS**

Thursday, August 2nd 2007, 6:32 PM

The upscale Nobu restaurants partially owned by actor Robert De Niro cheated more than 100 workers by taking a bite out of their tips, according to a lawsuit brought by two former waiters.

The lawsuit, filed Thursday in U.S. District Court in Manhattan, seeks unspecified damages on behalf of workers at Nobu Corp.'s downtown Manhattan businesses, Nobu and Nobu Next Door, and its midtown location, Nobu 57.

The Nobu chain includes 11 restaurants in the United States and eight abroad, including three in London. De Niro is a part owner of the Manhattan restaurants.

In the lawsuit, waiters Alisa Agofonova and Aaron Pou allege they were forced to share tips with restaurant management. The lawsuit also alleges the restaurants failed to pay employees overtime.

The waiters asked that their lawsuit be designated as a class action so current and past employees could benefit from litigating common issues without putting their jobs or reputations at risk.

Nobu lawyer Carolyn D. Richmond said the restaurants will vigorously defend the litigation.

"We firmly believe that the restaurant has been in full compliance with all state and federal wage and hour laws and that our position will be vindicated in the court system," she said.

Pou, who worked at a Manhattan Nobu from 2001 until 2006, said he complained to owners Drew Nieporent and Richard Notar, who are listed as defendants, privately and later at a 2002 staff meeting they attended. He said De Niro was not active at the restaurant site and he doubted he even knew about the practice.

"We were told if you don't like the system, you can go somewhere else," he said. "That meant it wasn't changing."

Pou, of San Francisco, said other employees were annoyed that managers were taking money from the tip pool but were not interested in speaking out about it because they were "making enough money that they didn't think it's worth the hassle or the fight."

He said he was fired in February 2006 for eating while on break in the back of the restaurant.

Pou, who made $70,000 one year at the restaurant, said he did not believe the firing was related to his complaints. He said he now works as an art director at a design studio.

"I'm not looking to do anything vindictive, just to set the record straight," he said. "And maybe people in the future will think twice about not following a law."

Agofonova, of Harlem, said she noticed that floor managers sometimes received more in tips than she received while she worked at Nobu 57 from January 2006 until March.

She said the managers, who were not entitled to tips according to state law, would meet once a week to decide

how much in tips each employee would receive.

She said she began working at Nobu 57 after working at a Nobu in Las Vegas, where she found employees were paid fairly.

A lawyer for Agofonova and Pou, D. Maimon Kirschenbaum, said the lawsuit was one of about a dozen cases he had filed in the last year alleging unfair wage practices at Manhattan restaurants.

"Why does a successful establishment need to pay their employees out of waiters' tips? It's heinous," he said. "It is almost impossible to understand. If you need more money to pay your managers, charge more for your food. I feel they're just doing it because they can."




| Home | Archives | Calendar | E-Newsletters | Subscribe | **MUFSO** |

SEARCH  -Select an opt

| News | Food & Beverage | Operations | HR & Labor | Marketing | Chains | Independents | Opinions | Events | Commu |

# Wage-and-hour suits put industry on defensive

**Tipping, rest break policies at issue in spate of legal fights**

By MILFORD PREWITT



**Wage-and-hour woes: A tight labor market, aggressive trial attorneys and nebulous employment policies put operators on the defensive amid a spate of class-action lawsuits**

**(Nov. 19)** The restaurant industry already is infamous for long hours, relatively low pay and physically demanding work. But now a barrage of lawsuits, judges' decisions and heightened regulatory initiatives are suggesting that in some places restaurant work is unfair and exploitative, too.

The number of lawsuits alleging that restaurant employees have been forced to work off the clock, directed to share tips with managers, denied meal breaks or rest periods, incorrectly compensated, or discriminated against is on the rise, according to attorneys who represent both plaintiffs and defendants. Those same attorneys say some of the factors pushing up the number of wage-and-hour violations are the tight labor market, which is compelling some employers to willfully skirt the law, and trial lawyers in search of cases with class-action potential.

In the state of New York, where a mounting caseload of complaints about wage-and-hour violations has reached "epidemic" proportions, according to groups representing immigrant workers, officials at the state Department of Labor reported that collections of unpaid wages in all industries throughout the state jumped 36 percent in the past year, to $10.4 million. As a result, the department has created a special unit to do nothing but pay calls to restaurateurs, retailers and construction trades suspected of cheating employees.

Earlier this year, the California Supreme Court issued a ruling that established a longer liability period for employers across the state that violate mandatory meal-and rest-break requirements. The decision in Murphy v. Kenneth Cole Productions Inc., which found that the amount paid to a worker by an employer for failing to provide a meal or rest break is considered a "wage" with a statute of limitations reaching back three years. It was expected to have a multimillion-dollar impact on the restaurant industry, which has been hit hard by wage-and-hour violations in the state in recent years.

More recently, **Applebee's** was ordered by a federal magistrate in Kansas to provide the names and contact information of some 42,000 current and former workers who may be eligible to join a class-action lawsuit alleging that the dinnerhouse giant illegally applied a tip credit when servers spent more than 20 percent of a shift on tasks that should have compensated them the minimum wage.

Complaints also recently were lodged against chef-restaurateur Jean-Georges Vongerichten and fine-dining operator Drew Nieporent, both in New York and both charged with letting their companies' managers share in tip pools.

Allegations of wage-and-hour violations also have ensnared the Fireman Restaurant Group, **Smith & Wollensky Restaurant Group** and **Restaurant Daniel**. Both S&W and Restaurant **Daniel** settled their suits out of court. S&W

paid an undisclosed sum to settle its wage-and-hour suit, but the New York Times reported that Daniel paid $80,000 to end a suit alleging that workers were denied promotions because of race and ethnicity. FRG officials have said previously that they would vigorously defend their company.

Few lawyers are surprised that such seemingly black-and-white issues as paying minimum wage, granting rest periods or keeping managers hands out of the tip till have become so litigious.

Whether their clients are restaurant employees or restaurant owners, lawyers on opposing sides agree that the restaurant industry's long tradition of assigning front-of-the-house staff to a variety of jobs in the same shift and the way trial lawyers pick their cases are fostering the wave of litigation.

First, lawyers say, wage-and-hour violations are far more lucrative than harassment or discrimination lawsuits. Such suits are quicker to resolve and often have a bigger payday given that the plaintiff is usually a group of people, versus lone individuals in harassment or discrimination suits, lawyers note. Moreover, lawyers point out that in many states and in federal cases if the employer-defendant loses, they pay punitive and compensatory damages as well as a host of fees, penalties and other court costs that could zoom up into the hundreds of thousands of dollars for the plaintiff group.



**Sherrill Colombo, who defends hospitality employers in Miami for Cozen O'Connor, says wage-and-hour litigation constitutes "low-hanging fruit" to her adversaries.**

Second, attorneys, government regulators and academics say that with labor being so tight in the restaurant industry, some employers are being tempted to indulge in the so-called "Wal-Mart Syndrome," a practice where employees work off the clock before or after their shifts to drive productivity. The practice is named after the nation's largest retailer for its alleged practice of forcing employees to work off the clock while cleaning up the stores and restocking shelves after hours. In some cases, company managers were alleged to have locked employees in the stores until the units were ship-shape. At least 150,000 workers are eligible to join one class in what the company reported to be 57 lawsuits over wage-and-hour violations in its 2006 annual report.

In the fine-dining side of the business, especially in big cities like New York, San Francisco, Boston, Chicago or Miami, another factor fueling claims of maltreatment by workers is the yawning pay gap between servers and managers. Because some servers at hot restaurants make six figures annually, versus the mid- to high-five-figure range for maître d's or managers, some operators promise their front-of-the-house managers a piece of the tip pool to keep them on board and shave labor costs, lawyers contend.

Sherril Colombo, an attorney who defends hospitality employers in labor trials for Cozen O'Connor in Miami, suspects the number of cases involving restaurant employers over wage-and-hour violations have increased 30 percent in the local, federal district court house in the past few years.



**Applebee's is facing a class-action lawsuit related to its handling of employees tips and was ordered to provide**

Colombo says she believes aggressive plaintiff attorneys see such cases as "low-hanging fruit" and are aggressively marketing themselves through Internet sites and traditional advertising as justice seekers for minimum-wage employees who feel they have been ripped off.

"I don't think employers are doing anything different than in years past," she says. "They are not more greedy or ignorant of the law. But I do think what is new is that you have a new class of attorney out there who knows how to exploit a case when they see an opening and, sad to say, some restaurant employers are giving them a big opening."

Colombo said one frustration she encounters with restaurant clients is that while they are not willfully cheating workers out of their just desserts, they nonetheless classify people in the wrong positions or let managers participate in tips as a way to reduce turnover.

"This is a very transient industry," she says, "and what I think happens is that some employers, as well-meaning as they may be, are trying to breed loyalty by offering certain compensation perks they really don't have the right to offer."

D. Maimon Kirschenbaum, a New York-based employee rights attorney at Joseph &

**42,000 former or current employees who may be eligible join the suit.**

Herzfeld, agrees that thanks to a technical procedure within the law governing the Fair Labor Standards Act, it is somewhat easier to file class-action lawsuits over wage-and-hour issues than it is to file class actions alleging racial or sexual discrimination in civil court.

In-depth, relevant, timely information products, services, menu trends, business opportunities. **Learn More»**

NRN's Foodservice Resource Center

Kirschenbaum is the lawyer who brought the tip-pool sharing suits against Vongerichten and Nieporent, and he just secured class-action status against Heartland Brewery.

But Kirschenbaum refutes charges that the plaintiff bar is enriching itself by exploiting the law and shaking down employers by soliciting uneducated workers.

While he admits that his law firm is doing quite well going after restaurateurs who steal tips or work minimum-wage employees off the clock, he defends the firm's success ultimately as performing a social good.

"Yes, this is a good business to be in, and we are quite a busy law firm because we are helping people who otherwise would have few places to protect themselves," he says. "I know that there are those who claim that the kind of law we practice gives trial lawyers a bad name, but I have never, ever sought out a client or solicited them. They seek me out."

Kirschenbaum's law firm has a link and an ad on **Shamelessrestaurants.com**, one of about a dozen hugely successful but antagonistic restaurant blogs, along with **Stainedapron.com** and **Bitterwaitress.com**, where restaurant employees anonymously indulge in "cybersmear," airing their employers' dirty laundry as well as tales of mistreatment by customers.

Kirschenbaum said he does not see the marketing at a website hostile to the industry's employers as solicitation in the classic definition of the word.

"These workers are poor, they are being stepped on by their bosses, treated like garbage, and the word is out there that we're going to stand up for your rights," he insists. "I'm proud of what I do.



**Fine-dining operator Drew Nieporent is facing a lawsuit alleging he allowed managers to share employee tips.**

"It's immoral to steal your servers' tips."

Officials at the New York State Department of Labor say they are doing all they can to reduce Kirschenbaum's client list.

Christine Perham, a policy specialist with the department, says new commissioner M. Patricia Smith, formerly an assistant state's attorney general who specialized in labor issues for 10 years, reconfigured a branch of the department that used to go after worker mistreatment in New York's extinct garment industry to retarget it's enforcement powers on minimum-wage violations in the restaurant industry and other retail.

High on the hit list are employers in foodservice and retail with staffs of deliverymen, she notes.

Perham says complaints filed with the agency from rank-and-file workers have been growing in recent years. She suspects complaints from the restaurant industry are on the rise because some unscrupulous employers think they can take

advantage of the agency's lack of manpower and resources.



**D. MAIMON KIRSCHENBAUM ATTORNEY, JOSEPH & HERZFELD**

"I think some employers know we don't have the manpower to be everywhere, but they err if they think we won't catch up with them," she says. "This is why we are doing sweeps. We are adding more people who speak foreign languages, and we have set up offices all over the state for workers to contact us if they think they are being underpaid or mistreated."

In "Unregulated Work in The Global City: Employment and Labor Law Violations in New York City," a recently published, peer-reviewed study by the nonpartisan Brennan Center for Justice at New York University Law School, researchers contend that the impressive rebound of the restaurant industry after the terrorist attacks of Sept. 11, 2001, and the disproportionate number of immigrant and minority workers in the business is tempting restaurant employers to break the law.

"The result is fierce and unceasing competition, driving many restaurants to compete on the basis of cost cutting," the authors wrote. "Because rent and food costs are essentially fixed, it is wages and benefits that often end up being cut. And while 50 years ago unions were able to set a wage floor, in the [restaurant] industry currently there is very little union presence.

"The upshot is that the workers, currently about 160,000, face difficult working conditions with frequent workplace violations."

Paul Sonn, co-director of the Economic Justice Project of the Brennan Center, says what he takes away from his colleagues' work is that restaurant employers are relying on old traditions and not the law in managing and paying their workers.

"We believe that part of the problem is that there is an operational tolerance for some of these abuses in the restaurant workplace," Sonn says, "and that is complicated by the fact that no one is really educating employers about what is right or wrong until it ends up in court.

"There is growing evidence that these abuses are widespread, but I think too many employers indulge in it because their competitors are getting away with it, too, and they don't want to be at a competitive disadvantage. Yet they are the first to cry that they are being unfairly penalized when caught."

Sonn says the birth of the Restaurant Opportunities Center of New York, or ROC-NY, a group that fights unfair labor practices subjected on servers and cooks and is often likened to a union, is a result of the spreading maltreatment of foodservice employees.

**© 2007 Nation's Restaurant News. All Rights Reserved.**    **Home** | **About Us** | **Contact Us** | **Privacy Policy** | **FAQ** | **Advertise** | **Subs**

# Jay-Z's club faces pay rap

BY THOMAS ZAMBITO
DAILY NEWS STAFF WRITER

Wednesday, July 2nd 2008, 4:00 AM

Rap mogul Jay-Z could soon be shelling out the Benjamins for forcing workers at his trendy 40/40 club to pick up the tab for deadbeat customers.

Manhattan Federal Judge Loretta Preska said current and past servers, bartenders and others who've toiled at the downtown sports bar and lounge could be eligible for a payout from a suit certified as class action Tuesday.

Some 20 workers accuse club managers of making them work for tips only, cheating them out of overtime and forcing them to pay for breaks and spills as well as "walkouts."

Hundreds of former employees could be eligible to collect if the workers' claims are successful at trial, their attorney says.

Preska said the workers' lawyers have made a "minimal" showing that the owners have violated federal wage and labor laws.

"The record contains corroborating evidence of the allegations," Preska wrote.

An earnings report for at least two workers showed they did not receive overtime for hours worked beyond the 40-hour workweek, Preska noted.

"It's a good day for restaurant workers throughout the city," said workers' lawyer Maimon Kirschenbaum.

tzambito@nydailynews.com




April 4, 2008

## Starbucks Sued in New York Over Tip Issue

**By STEVEN GREENHOUSE**

A former barista sued Starbucks on Thursday, accusing the company of cheating thousands of baristas in New York State by giving a share of their tips to shift supervisors.

In papers filed in Federal District Court in Manhattan, lawyers for the barista, Jeana Barenboim, asserted that Starbucks had violated a state law that bars employers or agents of an employer from receiving part of workers' tips.

The lawsuit was inspired by a ruling last month in which a state judge in San Diego awarded $105 million to baristas throughout California, after finding that Starbucks had improperly allowed shift supervisors to share tips.

At Starbucks' more than 7,000 shops nationwide, the baristas leave a tip jar near the checkout counter. The workers pool the tips each week, and typically shift supervisors and baristas divvy up that money based on the hours each employee has worked. Other types of supervisory employees, like shop managers and assistant managers, do not share in the tips.

Maimon Kirschenbaum, one of the lawyers who brought the case in New York, said, "We're making literally the same pitch as was made in the California case, that Starbucks let the shift supervisors partake in the tip jar."

He asked the federal court to make the case a class action on behalf of all baristas in New York State.

In a statement, Starbucks said it was unfortunate that copycat lawsuits had been filed in the weeks after the California ruling and that it intended to appeal. "Our tip policy allows hourly partners (baristas and shift supervisors) to receive their fair share of customer tips," the company said. "Shift supervisors are not managers and have no managerial authority." The company said that shift supervisors often do the same work as baristas.

The $105 million award in California stung and embarrassed Starbucks at a time when store sales had dropped for the first time. It is even closing some shops.

In a voice mail message to employees last week, posted on the company Web site, Howard Schultz, the company's chairman, called the California ruling "extremely unfair and beyond reason." Mr. Schultz told employees, "I want to personally let you know that we would never condone any type of behavior that would lead anyone to conclude that we would take money from our people."

In New York, Starbucks has been hit by other problems. A year ago, the National Labor Relations Board

charged Starbucks with breaking federal labor laws 30 times, including the illegal firing of two workers who supported a unionization effort.

Daniel Gross, a leader of the unionization drive, said that after the California ruling was handed down, baristas in New York began debating whether shift supervisors should share in the tips.

"It's a very divisive issue," he said. "A lot of baristas feel that shift supervisors are part of our team, that they're absolutely on the floor with us, making drinks. Others don't feel that sense of camaraderie with them."

Liberté Locke, a barista at a Starbucks in Union Square, admitted feeling torn about sharing tips with the shift supervisors.

"On one hand, Starbucks sees them as management," she said. "They handle the cash. They handle the keys. They lock the doors. They run the stores when managers are away. They have power to discipline baristas through performance reviews. But on the other hand, they are paid significantly less than the other managers, and they often work alongside us.

"So part of me feels that they should be able to receive part of the tips," she continued. "But under the language of the law, I feel they shouldn't receive tips."

Ms. Locke said she earned $10.03 an hour after three years on the job, while a shift supervisor at her shop made $10.25 an hour, also after three years.

Several baristas said they typically received $1.20 an hour to $1.80 an hour in tips.

Mr. Kirschenbaum, the lawyer, said, "The fact that shift supervisors are underpaid doesn't mean that baristas should bear the brunt of that."

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map